# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
SALLY A. CEVASCO,                           \*
                                            \*   No. 23-0530V
                                            \*   Special Master Christian J. Moran
              Petitioner,                   \*
v.                                          \*
                                            \*   Filed: May 27, 2025
SECRETARY OF HEALTH                         \*
AND HUMAN SERVICES,                         \*
                                            \*
              Respondent.                   \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Elizabeth M. Muldowney</u>, Sands Anderson P.C., Richmond, VA, for Petitioner;
<u>Alec Saxe</u>, United States Dep't of Justice, Washington, D.C., for Respondent.

### <u>PUBLISHED DECISION DENYING COMPENSATION</u>[1]

     Sally Cevasco alleges that an influenza ("flu") vaccine damaged her ulnar nerve. Am. Pet., filed May 7, 2024. The Secretary disputes Ms. Cevasco's entitlement to compensation. Both parties have supported their positions with reports from expert witnesses and argued through memorandum. A review of the evidence and arguments shows that Ms. Cevasco is not entitled to compensation.

---

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

I.    **Facts**[2]

Ms. Cevasco was born in 1957.  Although she suffered from various medical problems, the Secretary has not alleged that any of these problems affect whether she is entitled to compensation.  See Resp't's Rep. at 2, 10-11.

Ms. Cevasco received the allegedly causal flu vaccination at a Walgreens Pharmacy on Monday, January 11, 2021.  Exhibit 16 at 10; Exhibit 19 at 1-2.  Justin Costa administered the vaccine into her left arm.  Exhibit 19 at 2.  According to a record created on March 1, 2021, the vaccine was "correctly placed."  Exhibit 21 at 3.  Ms. Cevasco has not asserted that the vaccine was administered into an unusual place.  See Exhibit 1 (petitioner's affidavit).

After receiving the vaccination, Ms. Cevasco remained in the store.  She felt her left hand was going numb.  Exhibit 1 at 1.  Ms. Cevasco told the pharmacist, who advised that because more than 15 minutes had elapsed, she could leave.  However, he asked her to call him if the numbness did not go away that afternoon.  Exhibit 1 at 2.

After the pain did not go away, the next day, Ms. Cevasco told the pharmacist that the numbness continued.  Exhibit 1 at 2.  Ms. Cevasco averred that the pharmacist told her: "'Obviously the needle must have hit a nerve.'"  Id.  The pharmacist directed Ms. Cevasco to consult her primary care physician.

Ms. Cevasco messaged her primary care physician, Uma Kolli, through the practice's patient portal system on Friday, January 15, 2021.  Ms. Cevasco complained about numbness in her left hand.  More specifically, Ms. Cevasco wrote:

> I got the flu shot for the first time this past Monday. Within a few minutes[,] my hand started getting numb. The pharmacist asked me to call him back each day to report about it. He said if it didn't go away within a few days[,] that he would file a report about it. Well, this is Friday[,] and it is the same. Still having numbness.

---

[2] The parties generally agree that the medical records created contemporaneously with the events described in the medical records are accurate.  Compare Am. Pet., filed May 7, 2024, at 2-5 with Resp't's Rep., filed Jan. 8, 2024, at 2-6.  Thus, the summary of this evidence is relatively brief.  More details can be found in the Amended Petition and the Respondent's Report.

Exhibit 17 at 4.

The next day, Dr. Kolli responded.  Exhibit 20 at 2.  After more electronic correspondence, Dr. Kolli recommended that Ms. Cevasco consult a neurologist. Id.

The Walgreens staff member, Mr. Costa, informed the Vaccine Adverse Event Reporting System that Ms. Cevasco "started having numbness in her left hand 15 minutes after an injection" on January 11, 2023.  Exhibit 23 at 1-2 (VAERS form submitted on Jan. 19, 2021).  Mr. Costa also reported that the numbness had continued for eight days.  Id. at 2.

Ms. Cevasco averred that she had difficulty finding a neurologist with an open appointment.  Exhibit 1 at 2.  The appointment took place on March 1, 2021, and the neurologist whom Ms. Cevasco saw was Megan Callahan.  Exhibit 21 at 2-4.  Ms. Cevasco informed Dr. Callahan that she first started experiencing left hand numbness within minutes of receiving a flu shot on January 11, 2021.  In this appointment, Ms. Cevasco stated that the vaccination did not seem to be placed abnormally.

Dr. Callahan examined Ms. Cevasco.  Dr. Callahan detected mild weakness on abduction and adduction of the left fingers.  Exhibit 21 at 3.  Ms. Cevasco had decreased sensation in her left ring finger and left small finger.  Dr. Callahan diagnosed Ms. Cevasco as having a "lesion of [the left] ulnar nerve, left upper limb."  Dr. Callahan also commented about potential causes:

> 63-year-old woman with onset of paresthesias in the left ulnar nerve distribution immediately after a vaccination. By her description the back seen [sic, probably "the vaccine"] was correctly placed so it would not relate to direct injury to the ulnar nerve. It may relate to a lower trunk brachial plexopathy but she does not describe having severe pain. No evidence of a polyneuropathy or of transverse myelitis. She does have sensitivity over ulnar nerve and also the scalene muscles on the left side.

Exhibit 21 at 3.  Dr. Callahan anticipated a progressive improvement and recommended a return visit.

In conjunction with the follow-up appointment, Ms. Cevasco underwent EMG/NCS testing.  Exhibit 21 at 8 (May 7, 2021).  This testing confirmed Ms. Cevasco suffered from a left ulnar neuropathy.  Id.  The parties' experts agree that

Ms. Cevasco had a left ulnar neuropathy.  Exhibit 34 (Dr. Bodor's report) at 5-7; Exhibit A (Dr. Donofrio's report) at 6.

*Ulnar Neuropathy*

Ulnar neuropathy "is more common in middle age and typically peaks between 50 and 80 years of age."  Exhibit A-1 (Andrew Hannaford and Neil G. Simon, "Ulnar Neuropathy," in <u>Handbook of Clinical Neurology</u> (C. Chalk ed.)) at 103.  After carpal tunnel syndrome, ulnar neuropathy is the second most common compressive neuropathy.  <u>Id.</u>

The ulnar nerve originates with cervical and thoracic nerves and goes to the fourth and fifth digits of the hand.  <u>Id.</u> at 104.  Ulnar neuropathy at the elbow is "most frequently caused by chronic compression or traction of the nerve."  <u>Id.</u> at 107.

Ms. Cevasco continued to see doctors about her ulnar neuropathy periodically.  These visits to care for her ulnar neuropathy do not shed much, if any, light on the cause of the ulnar neuropathy.

## II.    <u>Procedural History</u>[3]

Ms. Cevasco initiated the case by filing her petition on April 18, 2023.  (Later, she amended her petition).  She supported her claim by submitting affidavits and medical records the next day.  An initial comprehensive scheduling order was issued August 31, 2023.

The Secretary reviewed the material and recommended that compensation be denied.  Resp't's Rep., filed Jan. 8, 2024.  In the particular, the Secretary maintained that Ms. Cevasco had not provided the report of a medical expert to support her claim.  <u>Id.</u> at 10.

The parties supported their positions by filing expert reports.  Each party retained one expert: Dr. Bodor for Ms. Cevasco and Dr. Donofrio for the Secretary.  Each expert, in turn, wrote two reports: Exhibits 34 and 46 for Dr. Bodor and Exhibits A and C for Dr. Donofrio.

Each party enjoyed an opportunity to argue through memoranda.  In accord with the Initial Comprehensive Scheduling Order, Ms. Cevasco identified three cases that supported her claim for compensation.  Pet'r's Status Rep., filed May 13,

---

[3] The procedural history is straightforward.

2024.  The Secretary distinguished these cases and brought forward other cases that, in the Secretary's view, were in line with a denial of entitlement.

The case can be resolved on the papers without receiving oral testimony. See Kreizenbeck v. Sec'y of Health & Hum. Servs., 945 F.3d 1362, 1365 (Fed. Cir. 2020).  Ms. Cevasco has enjoyed a full and fair opportunity to present evidence and argument.  See Pet'r's Status Rep., filed Nov. 18, 2024 (declining to present additional expert reports).

## III.   Standards for Adjudication

A petitioner is required to establish her case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).  Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

The Vaccine Act requires that petitioners establish five elements.  42 U.S.C. § 300aa–11(c)(1)(A) through (E).  Here, the parties dispute whether Ms. Cevasco has established that the flu vaccine caused her ulnar neuropathy.  Because the Vaccine Injury Table does not associate the flu vaccine with vasculitis, Ms. Cevasco must pursue a claim that the flu vaccine was the cause-in-fact of the ulnar neuropathy.  See Am. Pet. at 1 (preamble).  For causation-in-fact claims, a petitioner bears a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury."  Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

5

IV.    <u>**Causation**</u>

A.    **Althen Prong One – Medical Theory**

To explain how the flu vaccination harmed Ms. Cevasco, Dr. Bodor proposes that the vaccination was administered into the teres minor tendon of the rotator cuff and caused pseudo ulnar neuropathy.  Exhibit 34 at 6, 8.  In doing so, Dr. Bodor opined that "the finding of ulnar neuropathy at the elbow is incidental." <u>Id.</u> at 8.  Dr. Bodor cited nine articles of which the potentially most supportive is the article filed as Exhibit 40 (PL Escobar and J. Ballesteros, "Teres minor. Sources of symptoms resembling ulnar neuropathy or C8 radiculopathy," 67 Am. J. Phys. Med. Rehabil. 120 (1988)).

In proposing this theory, Dr. Bodor explicitly rejects two other theories. First, he stated that a vaccination needle is too short to reach the ulnar nerve because a vaccination is placed into the deltoid muscle, which is on the opposite side of the arm from the ulnar nerve.  In addition, if the needle caused direct trauma to the ulnar nerve, the pain would manifest immediately and Ms. Cevasco did not have pain immediately.  Exhibit 34 at 6.  Second, Dr. Bodor rejected the possibility that the vaccination led to an immune-mediated reaction.  Dr. Bodor stated that the onset of Ms. Cevasco's numbness within 15 minutes precluded an immune-mediated reaction.  <u>Id.</u>

With respect to the abstract theory Dr. Bodor proposed, the response from Dr. Donofrio is not a model of clarity.  (As discussed next, Dr. Donofrio makes persuasive points about Ms. Cevasco specifically.)  Although Dr. Bodor proposes a theory based upon an injection into the "teres minor *tendon*," Dr. Donofrio states that the deltoid muscle, into which the flu vaccine was administered, is "a great distance from the teres minor *muscle*, which is located posteriorly in the shoulder region."  Exhibit A at 6 (italics added).  Thus, Dr. Donofrio's opinion as to whether a needle for a vaccination administered into the deltoid muscle can reach the teres minor tendon is unclear.

Dr. Bodor makes a similar point in his responsive report.  He wrote that although Dr. Donofrio is "correct with regard to the teres minor muscle, [he] is not correct with regard to the teres minor tendon, which lies precisely under the deltoid muscle when a patient is in a typical seated position with their arm at their side." Exhibit 46 at 1.

This evidence supports a finding that there is at least some basis for finding that a needle injected into the deltoid muscle could penetrate the teres minor

6

tendon.  (The undersigned notes that the experts have not discussed potentially relevant anatomic dimensions, such as the thickness of the deltoid muscle.)  A firmer finding as to whether this theory has been established with preponderant evidence is not required because even if the theory is accepted, Ms. Cevasco has not met her burden of proof in other respects as discussed next.

## B.    Althen Prong Two – Logical Sequence

The second Althen prong requires a preponderant presentation of "a logical sequence of cause and effect showing that the vaccination was the reason for the injury."  Althen, 418 F.3d at 1278.  With respect to this prong, at least two factors are relevant.  The first is the views of a treating doctor.  Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006).  Another is whether the reaction to the vaccine was consistent with the theory articulated by the petitioner's expert.  See Hibbard v. Sec'y of Health & Human Servs., 698 F.3d 1355, 1364 (Fed. Cir. 2012); Dodd v. Sec'y of Health & Human Servs., 114 Fed. Cl. 43, 52-57 (2013); La Londe v. Sec'y of Health & Human Servs., 110 Fed. Cl. 184, 205 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

As to the views of treating doctors, Ms. Cevasco identified three potential places in the record each involving her neurologist, Dr. Callahan.  Pet'r's Status Rep., filed Oct. 16, 2023.  In the earliest record, Dr. Callahan exonerated the flu vaccine as causing a "direct injury" to the ulnar nerve.  Exhibit 21 at 3 (Mar. 1, 2021).  In the next record, Dr. Callahan wrote that the ulnar neuropathy had "sudden onset with flu vaccination."  Id. at 6 (May 4, 2021).  In the most recent record, the history of present illness stated: "initial symptoms of ulnar neuropathy occurred after a flu shot; patient with subsequent vaccinations with no problem."  Exhibit 22 at 5 (July 7, 2022).  These latter notations, the ones from May 4, 2021 and July 7, 2022, constitute the memorialization of a sequence of events.  A treating doctor's recognition that a vaccination preceded the onset of a problem is not the same as an expression of causation.  Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d 1328, 1347–48 (2010); La Londe v. Sec'y of Health & Hum. Servs., 110 Fed. Cl. 184, 206 (2013), aff'd on other ground, 746 F.3d 1334 (Fed. Cir. 2014); Langland v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 421, 439 (2013) (stating that the special master was not arbitrary in finding that the records from treating doctors "reflect no more than intake histories or temporal associations"); Caves v. Sec'y of Health & Hum. Servs., 100 Fed. Cl. 119, 139–40 (2010), aff'd without opinion, 463 Fed. App'x 932 (Fed. Cir. 2012).

Ms. Cevasco also has not demonstrated that she responded in a way that her expert's theory predicted.  The Escobar article presents four people who felt pain

similar to the pain associated with ulnar neuropathy when their teres minor muscle was stimulated. An easily understood diagram shows a "trigger point" and "referred pain." Exhibit 40 (Escobar) at 121.

However, Ms. Cevasco's problem was numbness, not pain. Exhibit 17 at 4 (email to Dr. Kolli); Exhibit 21 at 2-4 (appointment with neurologist Dr. Callahan). As discussed by Dr. Donofrio, Ms. Cevasco did not complain about pain until June 7, 2022. Exhibit A at 6, citing Exhibit 22 at 6-7. The latency between the vaccination and Ms. Cevasco's onset of pain distinguishes her case from those Escobar reported.

Another important difference between Ms. Cevasco and the four people described in the Escobar case series concerns the presence of an ulnar neuropathy. The four patients in Escobar had EMG's and/or nerve conduction studies and all were negative. In contrast, Ms. Cevasco's EMG and nerve conduction studies revealed that she had ulnar neuropathy. Exhibit 21 at 8 (May 7, 2021), Exhibit 22 at 6, 9 (July 7, 2022); Exhibit 32 at 1-7 (Nov. 2, 2023). While Dr. Bodor dismissed the results of the EMG as "incidental," Exhibit 34 at 7, Dr. Donofrio persuasively wrote: "It is bold to call the ulnar neuropathy at the elbow incidental in the setting of 3 abnormal EMGs." Exhibit A at 7. Dr. Bodor did not answer this critique. See Exhibit 46 (responsive report).

Finally, a finding that Ms. Cevasco has not established that the flu vaccination caused her problems in her ulnar nerve is consistent with the outcome of a case the Secretary had cited, B.T. v. Sec'y of Health & Hum. Servs., No. 21-1213V, 2024 WL 4973025 (Fed. Cl. Spec. Mstr. Nov. 8, 2024). See Resp't's Status Rep., filed July 17, 2024. In B.T., the petitioner did not persuasively establish that the vaccine was administered poorly and did not report any paresthesias, numbness, or pain until approximately two weeks after the vaccination. B.T., 2024 WL 4973025, at *2 (chronology), *18 (analysis). In finding that B.T. was not entitled to compensation, the chief special master distinguished an earlier case in which a vaccine was found to cause an ulnar neuropathy: Salazar v. Sec'y of Health & Hum. Servs., No. 15-817V, 2021 WL 319393 (Fed. Cl. Spec. Mstr. Jan. 5, 2021). In Salazar, critical facts included that petitioner established that the vaccine was administered in an unusual way and the petitioner experienced pain immediately. Neither of these facts are present in Ms. Cevasco's case.

For all these reasons, Ms. Cevasco's attempt to assemble a series of steps connecting her vaccination with her ulnar nerve trouble is not logical.[4]  Therefore, she has failed to establish <u>Althen</u> prong two.  The absence of persuasive proof on this element means that Ms. Cevasco cannot receive compensation.  <u>W.C. v. Sec'y of Health & Hum. Servs.</u>, 704 F.3d 1352, 1358 (Fed. Cir. 2013) ("a petitioner must establish all three prongs of the <u>Althen</u> test"); <u>Hibbard v. Sec'y of Health & Hum. Servs.</u>, 698 F.3d 1355, 1365 (Fed. Cir. 2012); <u>Langland v. Sec'y of Health & Hum. Servs.</u>, 109 Fed. Cl. 421, 438 (2013) ("prong one of <u>Althen</u> must be demonstrated, for prongs two and three to matter").

### C.    Althen Prong Three – Timing

Ms. Cevasco's numbness began within approximately 15 minutes of her vaccination.  Although this onset might raise a suspicion that the vaccine caused her ulnar neuropathy, "[t]emporal association is not sufficient, however, to establish causation in fact." <u>Grant v. Sec'y of Health & Hum. Servs.</u>, 956 F.2d 1144, 1148 (Fed. Cir. 1992).  Further resolution is not required due to the failure of proof on prong two.

### V.    Conclusion

After the flu vaccination, Ms. Cevasco has experienced problems with her ulnar nerve.  Her medical condition warrants sympathy.  However, an assessment of the evidence shows that Ms. Cevasco has not met her burden of establishing that the flu vaccination harmed her.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed.  Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

---

[4] Because Ms. Cevasco's claim concerns her ulnar nerve, the outcome of Ms. Cevasco's case does not necessarily suggest a similar outcome for claims that a vaccination caused trauma to other nerves in the arm.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master